Filed 2/18/22  P. v. Livingston CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B306775 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA445708) |
| v. | |
| KAYVEON LIVINGSTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed in part, reversed in part, and remanded with instructions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Defendant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

The Los Angeles County District Attorney charged defendant and appellant Kayveon Livingston and codefendants Christopher Griffis and Alontae Green with murder (Pen. Code, § 187, subd. (a)[1]) and defendant and Griffis with shooting at an occupied building (§ 246).[2] The District Attorney alleged that in the commission of the murder and shooting a principal personally and intentionally discharged a firearm causing death (§ 12022.53, subds. (d) and (e)(1)) and the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subds. (b)(1)(C) and (b)(4)).

Defendant and Griffis were tried together before separate juries. Defendant's jury convicted him of second degree murder and shooting at an occupied building. It found true the gang allegations and not true the firearm allegations.[3] The trial court

---

[1]  All further statutory references are to the Penal Code unless otherwise stated.

[2]  The District Attorney also charged Green with attempted murder (§§ 664/187, subd. (a)) and shooting at an occupied motor vehicle (§ 246) and alleged firearm (§ 12022.53, subd. (c)) and gang enhancements (§ 186.22, subds. (b)(1)(C) and (b)(4)).

[3]  Griffis's jury convicted him of first degree murder and shooting at an occupied building and found true the firearm and gang allegations. Green was not tried with defendant and Griffis and the record does not reflect the disposition of the charges against him.

sentenced defendant to concurrent terms of 15 years to life in state prison.

On appeal, defendant contends that the trial court erred when it denied his *Batson*/*Wheeler*[4] motions, failed to instruct the jury on heat of passion voluntary manslaughter, admitted Griffis's social media posts, and admitted documentary evidence in support of the gang enhancement allegations. He further contends that recent amendments to section 186.22 in Assembly Bill No. 333 render deficient the jury instruction on the gang enhancement allegations and trial counsel provided ineffective assistance by failing to request an instruction on adoptive admissions. We reverse the jury's true findings on the gang enhancement allegations and remand the matter to the court to give the People the opportunity to retry the gang enhancement allegations under the amendments to section 186.22. We otherwise affirm the judgment.

## II.   BACKGROUND

At about 6:45 p.m. on March 14, 2016, Los Angeles Police Department Officer Joshua Parker responded to 1801 West Adams Boulevard. There, he saw Bradford Smith lying on the ground. Smith had been shot and killed. Smith was a member of the Rolling 20s Bloods gang who went by the gang moniker "Baby Slick."

Among the Rolling 20s Blood's rivals were the Rolling 30s Harlem Crips gang (Rolling 30s Crips). The Rolling 20s Bloods and Rolling 30s Crips shared a common border—Jefferson

---

[4]     *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

Boulevard—and had been rivals since the late 1970s. During February and March 2016, the rivalry between the two gangs was more active than at other times.

At about 10:38 p.m. on March 14, 2016, A.R. was working at Sammy's Liquor Store on 9th Avenue and Jefferson Boulevard. A.R. heard two series of gunshots about five minutes apart. Minutes later, Los Angeles Police Officer Brian Schneider arrived at the scene and observed Lorenzo Ambrosio lying on the ground. Ambrosio was still alive, but bleeding. Ambrosio later died from a gunshot wound. Sammy's Liquor Store was located in Rolling 30s Crips territory.

The Los Angeles Police Department obtained from Sammy's Liquor Store, two other area businesses, and a nearby residence videos of the area around Sammy's Liquor Store from the night of Ambrosio's shooting. They showed a white Chevy Malibu turn right on 9th Street traveling north towards Jefferson. Green and another person shot at the Chevy Malibu.

About three to six minutes later, Ambrosio was riding his bicycle on the sidewalk towards Sammy's Liquor Store. The Chevy Malibu drove towards the "same corner." A video showed a series of sparks and Ambrosio fall to the ground, apparently shot. The Chevy Malibu drove away.

A little over a month prior to the Sammy's Liquor Store shooting, Officer Schneider had stopped a white Chevy Malibu defendant was driving. About two months after the shooting, S.P. purchased that Chevy Malibu from Felix Chevrolet. When he purchased the car, he noticed a small hole in the back bumper. About two weeks after the purchase, he found a bullet casing on the car's windshield.

Federal Bureau of Investigation Special Agent Kevin Boles testified that Griffis's cell phone records indicated that on March 14, 2016, Griffis's phone was off or in airplane mode from 9:21 p.m. to 10:55 p.m. At 10:55 p.m., the phone connected with a cell tower that was in the general area of 1801 West Adams Boulevard.

Defendant's cell phone records for March 14, 2016, indicated that from 8:59 p.m. to 9:15 p.m., defendant's phone traveled east towards 1801 West Adams Boulevard. From 9:34 p.m. to 9:55 p.m., defendant's phone moved south from 1801 West Adams Boulevard towards the Coliseum. At 9:55 p.m., defendant's phone was just south of 9th Avenue and Jefferson Boulevard. At 10:01 p.m., defendant's phone traveled east towards 1801 West Adams Boulevard where it remained until 10:29 p.m. Between 10:32 p.m. and 10:40 p.m., defendant's phone made 11 connections with a cell tower that was within 2,100 feet of 9th Avenue and Jefferson Boulevard. Between 10:47 p.m. and 10:55 p.m., defendant's phone traveled back to an area near 1801 West Adams Boulevard. At 10:55 p.m., defendant's and Griffis's phones were in the general area of each other.

On March 16, 2016, defendant canceled his cell phone account.

Messages posted on Griffis's Facebook account included, "'RTBIP Baby Slick man, I just talked to you 2 minutes ago. Again, my ears huntink rn now.'" "RTBIP" stood for "Rolling 20s rest in peace." Underneath that message were crying face, praying hands, thumbs down, and gun emojis. Another message stated, "Body for body" followed by three thumbs down and gun emojis. The Rolling 30s Crips used a thumbs up gang sign. The Rolling 20s Bloods used a thumbs down sign to show disrespect

for the Rolling 30s Crips. Griffis's account included other messages disrespectful to the Rolling 30s Crips. Another message stated, "'Me nd blxxds was just pressing shit.'" The Rolling 20s Bloods replaced the two "o's" in "blood" with two "x's" or the Roman numeral for 20.

Griffis's Facebook account also included messages with K.P. K.P. wrote that she lived in Rolling 30s Crips territory. Griffis responded, "'I'm from 20s.'" K.P. wrote, "'Yeah, this shit ain't no joke. I'm really finna cry.'" Griffis responded, "'Man too late for that. We did that. We going back. We already went for blxxd.'"

Defendant's Instagram account contained photographs of defendant displaying Rolling 20s Bloods gang signs and signs disrespectful to the Rolling 30s Crips. One photograph showed defendant making the letters "C" and "K" with his hands, which stood for "Crip Killer."

On June 22, 2016, defendant and Griffis were arrested for murder. They were taken to a police station and placed in the same holding cell. The cell was equipped with a recording device. The prosecution played recorded conversations between defendant and Griffis that took place before and after the police interviewed them separately.

During a conversation before the police interviewed them, Griffis said to defendant, "They done a stake on us, fool." Defendant responded, "Yeap." Griffis said, "Saying I need to talk to the detective. To detective? I don't gotta talk to him. Huh? Fuck is you talking about detective?" Defendant responded, "Don't say shats."[5] Griffis replied, "Man, come on, homie. I'm

_____

[5]     Defendant testified that the word "shats" meant "like just shit."

6

solid." Defendant said, "You know I ain't saying shit. I don't have to say nothing to them."

Griffis said to defendant, "Let's pray, I hope he ain't no informant, fool." Defendant responded, "Huh?" Griffis repeated, "I hope he ain't no informant."

Griffis added, "I saw Baby Slick, fool. How the fuck is—" Defendant replied, "Say no names, man. Say no mas . . . . No shats."

In a conversation after the police interviewed defendant and Griffis, Griffis said to defendant, "Police know your car. And they trying to catch us for that hot one." Defendant said, "You didn't say nothing; right?" Griffis apparently indicated he had not said anything. Defendant said, "I said you didn't say no shats, huh?" Griffis responded, "Uh-uh, no shats, fool. Then they showed me pictures of your car, fool. Then they brought up the scenario." He added, "They said I was in the car, oh, which I wasn't, though. [Racial slur] ain't know shats. I don't know what. That the car was there, I don't know what happened, though. I don't know nothing." Defendant responded, "Uh-huh."

Griffis continued, "That's it. And they trying to, um—they telling me something about we with the phone, shats." Defendant responded, "Yes, so?" Griffis added, "Because they said the phone, shats. That we use the phone shats. And it shows, 23rd. You know? I don't know. I'm in a pickle, though." Defendant responded, "Huh."

Griffis said, "I got a feeling we could beat this shit, though." Defendant replied, "Yeah, for real. Bar full, I don't see how many [racial slur] is there."

Defendant asked Griffis, "What's trinksing (Phonetic . . .) me, fool?" Griffis responded, "Huh?" Defendant then asked

7

"What's tracksing (Phonetic . . .) me?" Griffis responded, "How the fuck is our phones in the same location fool?" Defendant said he did not know. Later, Griffis stated, ""[T]hey said that our phone, shats, is—was in the area. How is that possible? Yeah, we left it at DM house. That day." Defendant responded, "Uh-huh."

Griffis said, "They trying to see who was in the vehicle, bro." Defendant responded, "They don't even have that."

Defendant said, "I wasn't there. I wasn't driving. The car, I guess, was there. They saying it was, but, shit, I don't remember. I wasn't there. I wasn't driving." Griffis responded, "I just hope they don't try to zoom your license plate." Defendant said his car was there, there was "no way around it."

Later still, Griffis said, "I just want to know how—all of this shit. That's what's getting me, fool. Now can they match our phone? Wait. We did have our phones, fool. We did." An officer entered the cell and defendant did not respond to Griffis. After the officer apparently left, Griffis said, "Remember all them the phone calls, yeah, this bitch is, like, 'The shats in here.'" Defendant responded, "Man, it was supposed to be the airplane mode, shats." He added, "The shats was supposed to be off. The shats was off." Griffis responded, "It was on. Remember?"

Defendant said, "Whatever they got, they got it bro. . . . [¶—¶] Just don't give them nothing else. That's it."

Later, defendant said, "I'm just saying, we might be in here for life. . . . [¶—¶] If God get me out of this, He ain't gonna never worry about me doing nothing."

Still later, Griffis said, "Hey, and we didn't even really whack nobody. That [racial slur] from Barlem on a bike. It wasn't. It was [racial slur]." Defendant responded, "Right."

8

Near the end of the conversation, defendant stated, "I know we ain't perfect, God, but, please, please spare our souls, God. Please spare us. Please, God, spare us."

Los Angeles Police Officer John Thompson, the prosecution's gang expert, opined that Griffis and defendant were members of the Rolling 20s Bloods. The prosecutor presented Officer Thompson with a set of hypothetical facts based on the facts in this case and asked him whether the murder and shooting at an occupied building in the hypothetical were committed for the benefit of, at the direction of, or in association with the Rolling 20s Bloods. Officer Thompson responded that the crimes were committed "in the benefit and association."

At trial, defendant admitted being an affiliate of the Rolling 20s but denied being a member of that gang. He explained that he displayed gang signs in photos in order to appeal to the "crowd that [he] grew up around." He denied participating in Ambrosio's murder. He claimed that at 10:30 p.m. on the night of the murder, he let his friend Trayvonne Adams borrow his car. After Adams left in defendant's car, defendant realized that he had left his cell phone charging in the car. Adams was gone with the car for 30 minutes and then returned it. Soon after Adams returned the car, defendant noticed a bullet hole in the bumper.

## III.   DISCUSSION

A.     Batson/Wheeler *Motions*

Defendant contends the trial court erred when it denied his *Batson/Wheeler* motions. We disagree.

9

The state and federal Constitutions prohibit a party from using peremptory challenges to exclude prospective jurors based on race or gender. (*People v. Bonilla* (2007) 41 Cal.4th 313, 341.) African-American women are a cognizable group for purposes of *Batson/Wheeler* analysis. (*People v. Young* (2005) 34 Cal.4th 1149, 1173.) "The exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal." (*People v. Silva* (2001) 25 Cal.4th 345, 386 (*Silva*).)

A trial court employs a three-step process for resolving *Batson/Wheeler* motions. First, the moving party "must demonstrate a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*).) Second, if the moving party demonstrates a prima facie case, the opponent of the motion must then provide an adequate nondiscriminatory reason for the challenge. (*Ibid.*) "In evaluating a trial court's finding that a party has offered a neutral basis—one not based on race, ethnicity, or similar grounds—for subjecting particular prospective jurors to peremptory challenge, we are mindful that "'[u]nless a discriminatory intent is inherent in the prosecutor's explanation,'" the reason will be deemed neutral. [Citation.]" (*Ibid.*) "Third, if the opponent indeed tenders a neutral explanation, the trial court must decide whether the movant has proven purposeful discrimination. [Citation.]" (*Ibid.*)

At the third step, "the credibility of the explanation becomes pertinent. To assess credibility, the court may consider, "'among other factors, the prosecutor's demeanor; . . . how reasonable, or how improbable, the explanations are; and . . .

10

whether the proffered rationale has some basis in accepted trial strategy.'" [Citations.] To satisfy herself that an explanation is genuine, the presiding judge must make 'a sincere and reasoned attempt' to evaluate the prosecutor's justification, with consideration of the circumstances of the case known at that time, her knowledge of trial techniques, and her observations of the prosecutor's examination of panelists and exercise of for-cause and peremptory challenges. [Citation.]" (*Gutierrez, supra*, 2 Cal.5th at pp. 1158–1159.)

"We recognize that the trial court enjoys a relative advantage vis-à-vis reviewing courts, for it draws on its contemporaneous observations when assessing a prosecutor's credibility. [Citation.]" (*Gutierrez, supra*, 2 Cal.5th at p. 1159.) Thus, we defer to a trial court's credibility determinations "'"in the absence of exceptional circumstances."'" (*People v. Lenix* (2008) 44 Cal.4th 602, 614.)

"We review a trial court's determination regarding the sufficiency of tendered justifications with "'great restraint.'" [Citation.] We presume an advocate's use of peremptory challenges occurs in a constitutional manner. [Citation.] When a reviewing court addresses the trial court's ruling on a *Batson*/*Wheeler* motion, it ordinarily reviews the issue for substantial evidence. [Citation.] A trial court's conclusions are entitled to deference only when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' [Citation.] What courts should not do is substitute their own reasoning for the rationale given by the prosecutor, even if they can imagine a valid reason that would not be shown to be pretextual. '[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he

11

gives. . . . If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.' [Citation.]" (*Gutierrez, supra*, 2 Cal.5th at p. 1159.)

In fulfilling its obligation to make a sincere and reasoned effort to evaluate the prosecutor's explanation, "the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919 (*Reynoso*).) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings." (*Silva, supra*, 25 Cal.4th at p. 386.)

### 1.     Prospective Juror No. 12

Prospective Juror No. 12 was a widow with three daughters. She was a retired high school English teacher. Her deceased husband was a minster. Neither she nor anyone close to her had been the victim of a violent crime.

Prospective Juror No. 12's cousin was a police officer in San Francisco. She had nieces and nephews who were involved in gangs and the court system. One of her nephews was sentenced to 30 years in prison. Although her cousin was a police officer and she had nieces and nephews who were in gangs and the court system, she could be fair to both sides in the case.

Prospective Juror No. 12 stated she would give defendant the presumption of innocence even though he was dressed in

"county blues." She was a "very sympathetic" person. She had been deceived by people and forgiven them.

Prospective Juror No. 12 agreed that "it would be atrocious and disgraceful for the race of the defendant, the race of the victim, the race of the officer, the race of the third analyst to play any role in [her] decision in this case."

Prospective Juror No. 12's daughter was about to sit for the bar exam. While attending law school, her daughter had mentors who were prosecutors. Her daughter's experience with the prosecutors had been both positive and negative. Her daughter planned to become a defense attorney; her experience with prosecutors did not influence that decision.

Defense counsel asked a different prospective juror if the juror thought it was unfair that defendant started with a presumption of innocence. The juror answered, "Personally, he looks not guilty to me." The prosecutor then asked that prospective juror what about a person's appearance would "make them any more guilty or not guilty." The juror responded, "I think it's whether I see malice in someone's eyes." The prosecutor asked if anyone agreed "that you can look at someone—" Prospective Juror No. 12 raised her hand and said, "I'm sorry, yes."

Later, the prosecutor used a peremptory challenge to excuse Prospective Juror No. 12. Defense counsel made a *Batson/Wheeler* motion. At sidebar, defense counsel stated the prosecution was removing one of only three African-American jurors in the jury pool.

"Out of an abundance of caution" and without finding a prima facie case under *Batson/Wheeler*, the trial court asked the prosecutor to state his reasons for excusing Prospective Juror

13

No. 12.  The prosecutor stated he had five reasons.  First, the prospective juror had nieces and nephews who were "a part of gangs" and a nephew was serving a 30-year sentence.  Second, she was a teacher.  Third, she was the wife of a minister and surreptitious jail cell recordings included "a lot of talk about praying to God and having God save us."  Fourth, her daughter planned to become a defense attorney.  Fifth, she raised her hand when another juror said defendant looked innocent, indicating to him that she believed defendant was innocent based on the way he looked.

The trial court stated that it believed the prosecutor was going "a little bit far" with his fifth reason, noting that it did not know what Prospective Juror No. 12 meant when she raised her hand.  Nevertheless, the court denied defendant's *Batson/Wheeler* motion.  It ruled, "I did not find a prima facie case.  I don't know that one challenge to one juror is sufficient.  But assuming that there was a prima facie case, based on the reasons I give, I believe that the reasons are adequate, that the [prosecutor] ha[s] indicated they did not excuse this juror as a member of a cognizable class, and, therefore, for all reasons, I would deny the [*Batson/Wheeler*] motion."

Where, as here, a trial court does not find a prima facie case but nevertheless asks a prosecutor to state his reasons for a peremptory challenge, "'we infer an "implied prima facie finding" of discrimination and proceed directly to review of the ultimate question of purposeful discrimination.' [Citations.]" (*People v. Hardy* (2018) 5 Cal.5th 56, 76 (*Hardy*).)  Substantial evidence supports the trial court's ruling that defendant failed to show purposeful discrimination.

14

The prosecutor's reasons for excusing Prospective Juror No. 12 were race neutral. First, a prospective juror's contacts with, exposure to, or possible sympathy for gang members is a race-neutral reason for a peremptory challenge. (*People v. Watson* (2008) 43 Cal.4th 652, 679–680; *People v. Williams* (1997) 16 Cal.4th 153, 191; *People v. Cox* (2010) 187 Cal.App.4th 337, 347–348.) Second, a prosecutor properly may excuse a prospective juror based on the belief that the prospective juror's occupation renders her ill-suited to serve as a juror on the case. (*Reynoso, supra*, 31 Cal.4th at pp. 924–925, fn. 6; see also *People v. Barber* (1988) 200 Cal.App.3d 378, 394 [prosecutors often exercise peremptory challenges against teachers on the belief they are too liberal].) Third, it is permissible to exercise a peremptory challenge to a juror based on the prospective juror's spouse's occupation. (*People v. Trevino* (1997) 55 Cal.App.4th 396, 411.) Fourth, a peremptory challenge based on a prospective juror's connection to defense attorneys is race neutral. (See *Hardy, supra*, 5 Cal.5th at p. 81 [that prospective juror worked daily with attorneys and knew 50 to 60 civil and criminal defense attorneys was a legitimate reason to exercise a peremptory challenge].)

Defendant claims that a comparison of other prospective jurors the prosecutor did not excuse shows his reasons for excusing Prospective Juror No. 12 were pretextual. He notes that the prosecutor did not excuse two other prospective jurors who were teachers like Prospective Juror No. 12.[6] Also, another

---

[6] As defendant notes, however, defense counsel and not the prosecutor excused one of these prospective jurors. We add that when defense counsel excused that juror the prosecutor still had

15

prospective juror had a son who had served time in jail like Prospective Juror No. 12's nephew. The similarities between these prospective jurors and Prospective Juror No. 12 are insufficient for comparative analysis. "As our high court has explained, for a comparative analysis to be probative, a seated juror must have a "'substantially similar *combination* of responses," in all material respects' to an excused juror. ([*People v.*] *Winbush* [(2017)] 2 Cal.5th [402,] 443, italics added . . . .) 'Although jurors need not be completely identical for a comparison to be probative [citation], "they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge."' (*Ibid.*)" (*People v. Bryant* (2019) 40 Cal.App.5th 525, 540.) Defendant has not shown that these other prospective jurors had any other responses that aligned with Prospective Juror No. 12's responses and thus they were not materially similar in the respects significant to the prosecutor's stated basis for the challenge. (*Ibid.*)

2. <u>Prospective Alternate Juror No. 15</u>

Prospective Alternate Juror No. 15 was single and had no children. She lived with her grandmother. She worked in customer service for a freight forwarding company. She had never been the victim of a crime.

Prospective Alternate Juror No. 15 had a relative in law enforcement. She did not know that relative's employer. She had never had a bad experience with law enforcement.

unused peremptory challenges that he could have used to excuse that juror later in voir dire.

Prospective Alternate Juror No. 15 grew up in the Crenshaw District. Her home was surrounded by gangs. Defendant's affiliation with or membership in a gang would not negatively influence her against him. Growing up, she knew some gang members. Some, but not all, of them were criminals. If the prosecutor proved defendant's guilt, she would have no hesitation voting for guilty.

The prosecutor asked Prospective Alternate Juror No. 15 if she had any familiarity with the Rolling 20s Bloods and the Rolling 30s Crips. She answered, "Yes." When the prosecutor asked if she was comfortable talking about her familiarity with the gangs, she answered, "No."

The prosecutor then asked the trial court to speak with Prospective Alternate Juror No. 15 at sidebar to discuss her "personal experience" with the gangs. Prospective Alternate Juror No. 15 said, "I don't have any experience." The prosecutor stated that she had just said, "Yes." She, the prosecutor, and the court then had the following exchange:

"Prospective [Alternate] Juror No. 15: Well, when you say, 'experience,' what do—like do I know individuals? Or—

"[The Prosecutor]: It could be anything from, 'When I was in high school, I saw the graffiti of these gangs,' or it could be anywhere to, you know, 'I was a victim,' or 'my close friends were a victim of crimes committed by either gang,' or it could be something like, 'I grew up with them, and I'm friends with these people,' any of those things.

"Do you understand what I'm saying?

"Prospective [Alternate] Juror No. 15: Mm-hmm.

"The Court: I think if we're going to have a sidebar, we're more interested in whether you have personal knowledge or

experience. Not generally if you know they exist or they're in your neighborhood.

"Do you follow what I'm saying?

"Prospective [Alternate] Juror No. 15: Mm-hmm. No personal experience.

"[The Prosecutor]: Can you tell me about the experiences that you have had with either of these gangs?

"Prospective [Alternate] Juror No. 15: I mean I'm familiar with it and—I mean when you say, 'personal experience,' do you mean do I know people personally?

"[The Prosecutor]: Sure.

"Prospective [Alternate] Juror No. 15: Oh, yes.

"[The Prosecutor]: If that's the way you want to define it.

"Prospective [Alternate] Juror No. 15: But not people that I actually associated with. Do I know them, yes, but—

"[The Prosecutor]: When you say you know them, are we talking about Rollin 20s Bloods, Rollin 30s Crips, or a little bit of each?

"Prospective [Alternate] Juror No. 15: A little bit of each.

"[The Prosecutor]: When you say you know them, you can say, 'You're asking too many personal questions,' and I'll respect that, but what do you mean by you know them?

"Prospective [Alternate] Juror No. 15: Because I grew up in that area, I just knew people in that area, but I didn't go to school over there. I went to a private school in the other like further away. So I didn't really associate with them, but I do know, like, know people.

"[The Prosecutor]: Are they your Facebook friends?

"Prospective [Alternate] Juror No. 15: No.

"[The Prosecutor]: Are they in your cell phone?

18

"Prospective [Alternate] Juror No. 15:  No.

"[The Prosecutor]:  Do you think you would know potentially men or women in their 20's that could be from either of these two African-American street gangs?

"Prospective [Alternate] Juror No. 15:  Not—I mean yes, in the past, but not now.

"[The Prosecutor]:  That's what I'm saying.  For example, let's say that hypothetically one of the intended victims in this case was someone—an intended victim, maybe not the person that was killed, but intended victim, if you had—I'm not speaking for you, but potentially if I had personal experiences with someone that I was friendly with and then I come into a criminal case where they might have been the intended target of a gang shooting, I think that is something that the defense attorney or the prosecutor would probably want to know as to whether or not you could be fair in our case.

"Do you see what I'm saying?

"Prospective [Alternate] Juror No. 15:  Mm-hmm.

"[The Prosecutor]:  That being said, if there are people that you know within these larger social groups, that I'm not saying you're apart [*sic*] of, but are in the universe of people you may know, do you think that will affect your ability to be fair in our case?

"Prospective [Alternate] Juror No. 15:  No.

"[The Prosecutor]:  Thank you, [Prospective Alternate] Juror No. 15.

"If you see someone either in a photograph, in a surveillance video, in [a] Facebook page that becomes part of the evidence as someone you recognize, someone you personally know, would you bring it to our attention?

"Prospective [Alternate] Juror No. 15: Yes.

"[The Prosecutor]: Thank you, [Prospective Alternate] Juror No. 15."

Later, after the prosecutor and defense counsel passed for cause on a group of prospective alternate jurors, the trial court asked the parties if they could agree on four alternates. Defense counsel stated he was fine with prospective alternate jurors numbers 15 through 18. The prosecutor was not:

"[The Prosecutor]: I'm not comfortable with 15 because of the ambiguity with if she knows different people who are maybe a part of this case, that's my concern with her. But I'm okay with 14, 16, 17, 18 and 20.

"The Court: We'll just exercise challenges.

"[The Prosecutor]: If it gets to a point I would be exercising a [per]emptory as to 15, if there is going to be a challenge I would like to deal with it now. Are you going to be doing a [*Batson/Wheeler*] in the event that I exercise my [per]emptory?

"[Defense Counsel]: Yes, I will.

"[The Prosecutor]: Then I would like to address it now.

"The Court: He says he's going to challenge, and he gets to do that first off so he would be able to challenge here.

"Are you making a [*Batson/Wheeler*] motion?

"[Defense Counsel]: Yes.

"The Court: At this point I'm actually going to find that there is a prima facia case, because there are two African[-]Americans that have been excused by the prosecutor. As before, I said there wasn't a prima facia case but I let you give a reason anyway.

"What did you want to say?

20

"[The Co-Prosecutor]: You said that there were two that prosecutors excused. There's only, I believe, one.

"The Court: She would be the second.

"[The Co-Prosecutor]: I'm sorry. I thought you meant two prior.

"The Court: No. I meant two altogether.

"One is very difficult. There are occasions where a single challenge can be subject to a [*Batson/Wheeler*] motion. I did not feel that was the case before. Now there are two, so I'm going to ask you—I'm making the necessary findings to trigger the requirement that you explain why.

"The last time I asked you voluntarily to do it. Now I'm telling you you have to justify it.

"[The Prosecutor]: Sure.

"My reasoning is because of the ambiguity as to knowing people who may be in the same social circles of these gangs, and there is almost—I cannot get with any clarity—

"The Court: By the way, for the record, we should say she's African-American.

"[The Prosecutor]: Yeah. I can't get with any clarity which particular group that is, whether it's the 20s or the 30s. And I can't get her to volunteer any additional information regarding the nature of those contacts. That makes me uncomfortable to keep her as a juror on this case."

"[Defense counsel]: With [the prosecutor] saying that he's okay with potential juror 14 but not 15, and they gave essentially the same answers, they grew up in a gang neighborhood but went to private schools, she was clear she does not have any Facebook friends who are gang members, she doesn't have any people in her phone who are gang members. She just may have known

21

them from the neighborhood.  That wasn't ambiguous; that was quite clear.

"And if that is the only reason, is ambiguity, I can't see that as a legitimate reason for [*Batson/Wheeler*] circumstances, being that her answers were essentially the same and that she doesn't live over there anymore.  She said she would tell us if she did know somebody.  I think that's—it's a very small chance, basically, saying if you grew up in the Crenshaw District that you can't be a juror, and that[ i]s absolutely opposite to what the jury process was set up for.

"The Court:  One more brief thing.  Go ahead.

"[The Prosecutor]:  I also think they're in the same age group as many of the people involved in this case.  If I had more clarity, if she was willing to volunteer clarity, I could make a decision, but based on the dearth of evidence I have as to which way her leanings would be that is my concern.

"The Court:  I'm going to find that the defendant belongs to a cognizable class.  I'm going to find that the reasons offered by the prosecution are race neutral, that he is not challenging her because of her belonging to a particular cognizable class, and I accept the reasons for two purposes:  one, there is evidence, I do think there is a difference between 14 and 15 because 15 is telling us that she actually knows actual people who belong to these gangs.  And by the same token, though, she's being vague about it, about her—I mean I myself was listening carefully to see how she was going to explain how she knew them, and she never really did explain how she knew people in the gang, she just said they were there.

"So I'm going to accept the prosecutor's reasons.  I'm going to deny the [*Batson/Wheeler*] motion."

It is unnecessary to consider whether any *Batson/Wheeler* error occurred as to Prospective Alternate Juror No. 15 because the original 12 jurors tried the case to its termination. That is, no alternate juror participated in the case resolution and thus Prospective Alternate Juror No. 15 never could have participated in the case resolution even if the prosecutor had accepted her. Accordingly, any error would necessarily be harmless. (*People v. Mills* (2010) 48 Cal.4th 158, 182 (*Mills*).)[7]

B. *Heat of Passion Voluntary Manslaughter Instruction*

Defendant contends the trial court erred and deprived him of due process when it failed to instruct the jury on heat of passion voluntary manslaughter. The trial court did not err.

1. Standard of Review

Heat of passion voluntary manslaughter is a lesser included offense of murder. (*People v. Moye* (2009) 47 Cal.4th

_____

[7] In such a circumstance, the prosecutor's reasons for challenging the prospective alternate can still be relevant if they are "unsupported, weak, or implausible, [and thus] may 'be considered part of an overall and deliberate plan to remove all African-Americans from the jury . . . .'" (*Hardy, supra*, 5 Cal.5th at p. 78, citing *Mills, supra*, 48 Cal.4th at p. 182.) The prosecutor's reasons for excusing Prospective Alternate Juror No. 15 were neither unsupported, weak, nor implausible (*People v. Elliott* (2012) 53 Cal.4th 535, 566 [inconsistent and ambiguous responses are proper reasons for exercising a peremptory challenge]) and thus did not support a claim that the prosecutor was engaged in an overall and deliberate plan to remove all African-Americans from the jury.

537, 549 (*Moye*).) A trial court must instruct, sua sponte, on all theories of a lesser included offense that are supported by substantial evidence, but not those without such evidentiary support. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]'" that the lesser offense, but not the greater, was committed. [Citations.]" (*Ibid.*)

2.    Analysis

Heat of passion arises when the victim has engaged in provocative conduct such that ""at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" [Citation.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.) Heat of passion voluntary manslaughter has an objective element—did the victim engage in conduct or did the defendant reasonably believe the victim engaged in conduct that would provoke a reasonable person to kill, and a subjective element—was the defendant actually acting under the influence of a strong passion induced by such provocation when he killed. (*Moye, supra*, 47 Cal.4th at pp. 549–550.)

24

Defendant reasons there was sufficient evidence of heat of passion because Green and another person near Sammy's Liquor Store fired shots at defendant's Chevy Malibu. That "provocative act induced fear, panic and anger in [defendant] and his companions causing them to react reflexively in response and to fire bullets in the general direction from where the earlier shots had been directed at them." At the time, defendant and his companions were in a "heightened emotional state" due to Smith's shooting death some four hours earlier.

There was no evidence that Ambrosio did or said anything provocative or that defendant reasonably believed that Ambrosio did or said anything provocative that would cause an average person to react with deadly passion. Green and another man, both on foot, shot at defendant's Chevy Malibu. A few minutes later, Ambrosio, who was by himself and riding a bicycle, was shot. Also, there was no evidence that defendant acted under the influence of a deadly passion. That is, defendant's claim that the provocative act of someone shooting at his car "induced fear, panic and anger in [him] and his companions causing them to react reflexively in response" is without support in the record. Defendant testified that he was not involved in Ambrosio's shooting and no witness testified that defendant was fearful, panicked, or angry at the time Ambrosio was shot. Accordingly, the trial court did not err when it did not give a heat of passion voluntary manslaughter instruction.

C.    *Griffis's Social Media Posts*

Defendant argues the trial court abused its discretion when it permitted the prosecution to introduce Griffis's social media

25

posts because they were hearsay not subject to the statement against interest exception in Evidence Code section 1230. He also argues the admission of the posts violated the Sixth Amendment's confrontation clause and denied him his due process right to a fair trial and his right to a jury trial by depriving him of the right to cross-examine Griffis.

1. <u>Hearsay</u>

a. Standard of review

We review a trial court's decision whether a statement is admissible as a statement against interest under Evidence Code section 1230 for abuse of discretion. (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).)

b. Background

During his opening statement, the prosecutor referred to Griffis's Facebook page. Defense counsel objected that evidence concerning Griffis's social media posts was not relevant and would violate defendant's confrontation clause rights.

The trial court asked the prosecutor to explain the relevance of the posts. The prosecutor stated that the posts were statements against penal interest made 10 minutes after Ambrosio's murder and showed defendant and Griffis were together.

The trial court asked the prosecutor to identify the statements at issue. The prosecutor stated, "'Me and Bloods was pressing shit'" and "'Body for body.'" The co-prosecutor added,

"'Rest in peace' or "BIP' Blood in peace, 'Baby Slick,'" and "'I think it's on two Bloods.'" He explained that "Baby Slick" was Smith.

Defense counsel argued Griffis's social media posts were relevant only to Griffis's case and should not be addressed in front of defendant's jury. The co-prosecutor responded that the posts were statements against penal interest and were not testimonial. Further, the posts were directly relevant to show that Bloods members were working together. The prosecutor added that the posts were statements made during a conspiracy.

Defense counsel argued the posts did not implicate defendant in any way. There was no evidence that Griffis and defendant were talking or acting in unison on the night Ambrosio was shot. Also, defense counsel would not be able to cross-examine Griffis about the posts.

The trial court ruled, "One, I do think most of this is a declaration against interest. [¶] Two, I think it's relevant to show that Griffis is in the gang, and they're trying to show that this was done for the benefit of the gang, so they're allowed to put in evidence that shows that Griffis is in a gang, even though it's going to be used against [defendant.]" It further ruled that the posts were not testimonial and therefore did not violate the confrontation clause.

c.     Analysis[8]

Hearsay evidence—that is, "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated"—is inadmissible unless made admissible by law.  (Evid. Code, § 1200, subds. (a) & (b).)  Evidence Code section 1230[9] provides that a declarant's hearsay statement that is made against the declarant's interest is admissible.  "As applied to statements

_____

[8]     The Attorney General argues defendant has forfeited this issue by failing to object in the trial court that the social media posts were inadmissible hearsay.  The record demonstrates the trial court understood the admission of the posts concerned, in part, their status as hearsay evidence and the hearsay exception for statements against penal interest.  (See *People v. Lucas* (1995) 12 Cal.4th 415, 466 [rejecting the People's argument that the defendant forfeited his claim that the trial court erroneously admitted irrelevant evidence because defendant objected to the evidence on the ground of lack of foundation, not irrelevance, stating that "the trial court evidently understood the objection as encompassing a relevancy claim, so we will reach the merits"].)

[9]     Evidence Code section 1230 provides:  "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

against the declarant's penal interest, in particular, the rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements. [Citation. Fn. omitted.]" (*Grimes, supra*, 1 Cal.5th at p. 711.) In determining whether a statement is admissible as against the declarant's penal interest, the question "'is always whether the statement was sufficiently against the declarant's penal interest "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," and this question can only be answered in light of all the surrounding circumstances.' [Citation.]" (*People v. Cortez* (2016) 63 Cal.4th 101, 127.)

Defendant argues that "Griffis's reference to 'me and Bloods' served not so much to implicate him in further criminal activity as to incriminate [defendant], a Rollin 20s member, in the killing of Ambrosio. Griffis's other comments such as 'body for body' and 'RTBIP Baby Slick man I just talked to you two minutes ago . . . [ ]' served to implicate Griffis in the alleged revenge shooting of Ambrosio. The further statement 'me and Bloods just pressing shit' served primarily to inculpate [defendant] since the inference to be raised by the jury was that Griffis did not act alone and that his accomplice was [defendant]—his [codefendant]."

Griffis's "'me and Bloods'" statement implicated Griffis in gang crimes and thus was against Griffis's penal interest because it supported a gang enhancement. Defendant concedes Griffis's "'body for body'" and "'RTBIP Baby Slick man I just talked to you two minutes ago'" statements implicated Griffis in Ambrosio's

29

shooting. Thus, they were against Griffis's penal interest. As defendant argues, the jury could infer from Griffis's "'me and Bloods just pressing shit'" that Griffis did not act alone in the shooting. That inference, however, included Griffis's participation in a criminal act and thus was against his penal interest.

The social media posts were admissible under Evidence Code section 1230 because a reasonable person in Griffis's position would have believed that the statements could subject him to criminal liability for Ambrosio's death, shooting at an occupied building, and a gang enhancement. Further, they were relevant to defendant's trial to show that the killing was gang related. Accordingly, the trial court did not abuse its discretion when it permitted the prosecution to introduce Griffis's social media posts.

### 2.    Confrontation Clause

The Sixth Amendment to the United States Constitution provides that "'"[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."'" (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 65 (*Gallardo*).) In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court "'held that the admission of "testimonial" out-of-court statements violates a criminal defendant's confrontation rights unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination [citation], or waived that right by his own wrongdoing [citation].' [Citation.] The court further held that the admission of 'nontestimonial' statements 'is the concern of

30

state and federal rules of evidence, not the [Sixth Amendment] Confrontation Clause.  [Citations.]" (*Gallardo, supra*, 18 Cal.App.5th at p. 66.)

Although *Crawford* did not "spell out a comprehensive definition of 'testimonial,'" [fn. omitted] it noted that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.  These are the modern practices with closest kinship to the abuses at which the [Sixth Amendment] Confrontation Clause was directed." (*Crawford, supra*, 541 U.S. at p. 68.)

The confrontation clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'  [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'  [Citation.]  An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Crawford, supra*, 541 U.S. at p. 51; see also *People v. Gutierrez* (2009) 45 Cal.4th 789, 813 ["The statement of a three-year-old declarant made to his aunt is more like 'a casual remark to an acquaintance' and is therefore not a testimonial statement under *Crawford*"]; *People v. Griffin* (2004) 33 Cal.4th 536, 579, fn. 19 (*Griffin*) [out-of-court statement made to a friend at school does not constitute "testimonial hearsay" under *Crawford*], disapproved on another ground by *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.)

Defendant contends that Griffis's social media posts were testimonial because "[a]ny reasonable person in Griffis's position would know that a statement suggesting participation in a

serious crime such as murder is highly likely to be used in future prosecution of that crime. More significantly in this instance is the fact the statements were made on social media, where they were subject to viewing by large numbers of people and could readily be accessed by law enforcement in the event of an investigation."

We disagree. Defendant's social media posts bore none of the indicia of testimony—they were not like "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact'" (*Crawford, supra*, 541 U.S. at p. 51). Nor were they like "prior testimony at a preliminary hearing, before a grand jury, or at a former trial," or statements made in "police interrogations." (*Id.* at p. 68.) Instead, Griffis's social media posts were like casual remarks made to an acquaintance, relative, or friend. (*Id.* at p. 51; *Gutierrez, supra*, 45 Cal.4th at p. 813; *Griffin, supra*, 33 Cal.4th at p. 579, fn. 19.)

### 3. Fair Trial and Jury Trial

In *Griffin*, the defendant contended the trial court erred in admitting a murder victim's out-of-court statement, contending the statement was inadmissible hearsay and violated his confrontation clause, due process, impartial jury, and other state and federal constitutional rights. (*Griffin, supra*, 33 Cal.4th at pp. 575–579.) The California Supreme Court held that the statement was not hearsay. (*Id.* at pp. 577–579.) Because the defendant's constitutional claims were premised on the assertion that the victim's statement was inadmissible, the court held, "the claims clearly lack[ed] merit in light of our conclusion that [the victim's] statement was properly admitted . . . ." (*Id.* at p. 579,

32

fn. 19.)  Defendant cites no case that stands for the proposition that out-of-court statements properly admitted over hearsay and confrontation clause objections are nevertheless subject to exclusion as a violation of the right to a fair trial or to a jury trial because the witness was not available to be cross-examined.  (See *ibid.*)  Accordingly, we reject defendant's fair trial and jury trial claims.

D.    *Ineffective Assistance of Counsel*

Defendant contends that defense counsel provided ineffective assistance when he failed to request the trial court to instruct the jury on adoptive admissions with CALJIC No. 2.71.5.[10]  We disagree.

---

[10]    CALJIC No. 2.71.5 provides: "If you should find from the evidence that there was an occasion when [a] [the] defendant (1) under conditions which reasonably afforded [him] [her] an opportunity to reply; (2) [failed to make a denial] [or] [made false, evasive or contradictory statements,] in the face of an accusation, expressed directly to [him] [her] or in [his] [her] presence, charging [him] [her] with the crime for which this defendant now is on trial or tending to connect [him] [her] with its commission; and (3) that [he] [she] heard the accusation and understood its nature, then the circumstance of [his] [her] [silence] [and] [conduct] on that occasion may be considered against [him] [her] as indicating an admission that the accusation was true. Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the [silence] [and] [conduct] of the accused in the face of it. Unless you find that [a] [the] defendant's [silence] [and] [conduct] at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement."

### 1. Background

As set forth above, during their recorded jail cell conversations, defendant and Griffis talked about various aspects of the Sammy's Liquor Store shooting and the police investigation. Neither the prosecutor nor defense counsel requested an instruction on adoptive admissions prior to closing arguments. During his opening and rebuttal closing arguments, the prosecutor referred to statements from defendant and Griffis's jail cell conversation and argued that defendant's failure to disavow Griffis's incriminating statements was an adoptive admission of those statements. For example, the prosecutor stated the following during his opening argument:

"Pre-interview, before being told why they're here, what the specifics are, I saw Baby Slick. That's what Griffin says— Griffin—Griffis says. No one had mentioned Baby Slick to these defendants before the interview. Why would Mr. Griffis say I saw Baby Slick? Can we all agree beyond all doubt that Christopher Griffis had a role to play in this murder? I think we can by his own words. Okay. So we know that Griffis was involved in the murder and we know he was there at 1801 West Adams based upon the cell phone evidence and based upon his own words of going for blood, body for body. He is a co-conspirator. He is an aider and abettor. He is a part of that plan that I'm talking about.

"Who is the other person who was a part of this plan? 'I saw Baby Slick, fool. How the fuck.' [Defendant] says, 'Say no names, man.' Think about that. The innocent response would be why the hell are we here? What—what the hell are we doing here about Baby Slick? What does that got to do with us, me and

34

you, being in this jail cell together?  That's what an innocent person would say.  But a guilty person would whisper, 'They don't even know that we know each other.'

"This is after the interview.  'Police know your car and they're trying to catch us for that hot one.'  An innocent person would say what hot one?  What the hell are you talking about?  I had nothing to do with this.  That's what an innocent person would say.  And if Mr. Griffis was never there, as this defendant said as he lied to you, if Mr. Griffis was never there, how would he even know that [defendant's] car was involved in this drive-by murder?  How would he know that there was any connection between [defendant] . . . and the murder had they not been there together?"

During his rebuttal argument, the prosecutor stated the following:

"Griffis' words are evidence against [defendant].  What they were speaking about when they were recording, when they were in a recorded conversation together is evidence against him.  It's called an adoptive admission.  It's in the jury instructions.

"Remember we talked about, if I told Steve, 'Hey, why did you steal my radio from me?'  And Steve just looks at me and goes (indicating), doesn't say anything and walks away, his conduct is an adoptive admission.  If you are being charged with murder, you've been investigated for murder, you've been interviewed for murder, and your friend is talking about a murder, and you're not saying anything other than repeating back to the police, 'I don't know,' that's an adoptive admission.  That is circumstantial evidence.  And it goes back to admission."

After the prosecutor's rebuttal argument, the trial court held a sidebar conference at which it noted that the jury had not

been instructed on adoptive admissions and asked the attorneys whether an adoptive admissions instruction should have been given. The prosecutor argued the instruction applied. Defense counsel argued Griffis's statements were not accusatory towards defendant.

The trial court declined to instruct the jury on adoptive admissions. It stated it thought the instruction applied, but did not want to reopen argument and was concerned the jury would give the instruction undue weight.

  2. <u>Analysis</u>

To establish ineffective assistance of counsel, a defendant must show that defense counsel's performance was deficient and prejudicial—i.e., that there was a reasonable probability that there would have been a different outcome absent counsel's deficient performance. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) A reviewing court may resolve an ineffective assistance claim by deciding only the question of prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"].)

Defendant's ineffective assistance of counsel claim is unavailing because defendant did not suffer prejudice as a result of defense counsel's failure to request an instruction on adoptive admissions; there was significant other evidence of guilt. Independent of any statement Griffis made to defendant in the jail cell, the evidence showed that defendant, Griffis, and Smith

were members of the Rolling 20s Bloods. The Rollings 20s Bloods and Rolling 30s Crips were rival gangs.

In the hours after Smith was shot and killed, video evidence showed defendant's Chevy Malibu involved in the Sammy's Liquor Store shooting. Sammy's Liquor Store was in Rolling 30s Crips territory. Cell phone evidence showed defendant and Griffis in the area. After the shooting, Griffis made incriminating social media posts. Two days after the shooting, defendant canceled his cell phone account. Within two months of the shooting, defendant sold his Chevy Malibu. In his jail cell conversation with Griffis, defendant repeatedly told Griffis not to say anything to the police, admitted his car was at the scene of the Sammy's Liquor Store shooting, said their phones were supposed to be off or in airplane mode, acknowledged that they might received life terms, and prayed that God would spare them.

E.    *Gang Evidence*

Defendant argues the trial court violated the confrontation clause when it permitted the prosecution to use conviction records of Rolling 20s Bloods members "to prove the dates of predicate offenses required to establish the gang enhancements under section 186.22." He further argues that recent amendments to section 186.22 in Assembly Bill No. 333 render deficient the jury instruction on the "pattern of criminal gang activity" element of the gang enhancement allegations and the evidence presented at trial was insufficient to establish that element under the new amendments.

1.     Confrontation Clause

At the time of trial, section 186.22, subdivision (e) provided: "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense and the offenses were committed on separate occasions, or by two or more persons . . . ."

To prove a "pattern of criminal activity" by the Rolling 20s Bloods, the prosecution introduced certified conviction records for two Rolling 20s Bloods members—Bryan Harris and Deleon Givens. The certified records for Harris showed he committed a robbery and dissuaded a witness on April 19, 2015. The certified records for Givens showed he committed a kidnapping for robbery and robbery on October 30, 2014. Officer Thompson testified that Harris and Givens were Rolling 20s Blood gang members at the time they committed those offenses.

Defendant did not object to the admission of Harris's or Givens's conviction records as violating his right to confrontation or at all. Accordingly, he has forfeited his confrontation clause challenge. (*People v. Redd* (2010) 48 Cal.4th 691, 730 [defendant "did not raise an objection below based upon the confrontation clause, and therefore has forfeited this claim"].)

38

## 2. Assembly Bill No. 333 Amendments to Section 186.22

Assembly Bill No. 333, which went into effect on January 1, 2022, amended and renumbered section 186.22, subdivision (e) as section 186.22, subdivision (e)(1) which provides: "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational . . . ."

Citing *In re Estrada* (1965) 63 Cal.2d 740, defendant contends Assembly Bill No. 333's provisions are ameliorative and thus apply retroactively to his case which is not yet final. The Attorney General concedes that most of Assembly Bill No. 333's provisions—including those at issue in this appeal—apply to non-final judgments.[11] We agree with the parties. (See *People v. Lopez* (2021) 73 Cal.App.5th 327, 343–344 (*Lopez*).)

---

[11] Assembly Bill No. 333 added section 1109 which permits a defendant to request a bifurcated trial on gang allegations. The Attorney General argues that section 1109 applies prospectively only. We need not decide whether section 1109 applies retroactively or prospectively as that is not an issue defendant raises in his appeal.

Defendant next contends that the jury was not properly instructed because the instruction on the gang enhancement allegations did not tell the jury that the offenses used to establish a "pattern of criminal gang activity" had to benefit a criminal street gang commonly in a way that was more than reputational, the last of those offenses had to occur within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, and the currently charged offenses could not be used to establish a pattern of criminal activity. The error was prejudicial and the gang enhancements must be reversed, he contends, because there was no evidence that Harris's and Givens's crimes commonly benefited a gang in a way that was non-reputational.

The Attorney General argues that remand is unnecessary because the jury would have found the gang enhancements to be true under section 186.22's new requirements. According to the Attorney General, there was overwhelming evidence that Rolling 20s Bloods members committed robberies that commonly benefited the gang in a way that was more than reputational. The predicate offenses included Harris's and Givens's robbery convictions. Officer Thompson testified that primary or common activities of the Rolling 20s Bloods included robberies and money acquired through criminal activity was shared among the gang members—for example, to post bail and purchase firearms.

In *Lopez, supra*, 73 Cal.App.5th 327, the Court of Appeal considered an insufficient evidence challenge to a jury's gang enhancements findings in light of the recent amendments to section 186.22. (*Id.* at p. 343.) It held that the gang enhancement findings had to be vacated because "the jury was not prohibited from relying upon the currently charged offenses

40

in determining whether a pattern of criminal gang activity had been proven, nor was it instructed that it had to find that the benefit to the gang from the charged offenses was more than reputational." (*Id.* at p. 346.) It rejected the People's argument that "evidence on these two points was presented to the jury that would have been sufficient to comply with these new statutory requirements." (*Ibid.*) It reasoned that "as the trial took place long before the statute was amended, the jury was not asked to, and therefore did not, make the factual determinations that are now required by the amendments to section 186.22. To rule that the existence of evidence in the record that would permit a jury to make a particular finding means that the jury need not actually be asked to make that finding would usurp the jury's role and violate [the defendant's] right to a jury trial on all the elements of the charged allegations. [Citations.]" (*Ibid.*) The court remanded the matter to give the People the opportunity to prove the applicability of the gang enhancements under the amendments to section 186.22. (*Ibid.*)

We agree with the *Lopez* court's analysis and thus reject the Attorney General's argument that we should affirm the jury's true findings on the gang enhancement allegations because there was evidence in the record from which the jury could have found the allegations true under the recent amendments to section 186.22. We vacate the jury's true findings on the gang enhancement allegations and remand the matter to give the People the opportunity to retry the gang enhancement allegations under the amendments to section 186.22. (*Lopez, supra*, 73 Cal.App.5th at p. 346.)

41

## IV.   DISPOSITION

The jury's true findings on the gang enhancement allegations are reversed.  The matter is remanded to the trial court to give the People the opportunity to retry the gang enhancements allegations under Assembly Bill No. 333's amendments to section 186.22 and for the court to resentence defendant as necessary.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.


We concur:



RUBIN, P. J.



MOOR, J.

42